IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 12, 2013

IN RE TALIAH L. B.

Appeal from the Circuit Court for Hamilton County
No. 11A160     Hon. Jacqueline Schulten Bolton, Judge

No. E2012-02102-COA-R3-PT - Filed April 2, 2013

This is a termination of parental rights case in which Custodial Parents sought termination of Mother's parental rights to the Child. The trial court granted the termination petition, finding that Mother willfully failed to support and visit the Child and that termination was in the best interest of the Child. Mother appeals. We affirm the decision of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Tiffany M. Campbell, Chattanooga, Tennessee, for the appellant, Tiffany B.

Michael S. Jennings, Chattanooga, Tennessee, for the appellees, Michael S. B., Jr. and Rebecca L. B.

Misty L. Harris, Chattanooga, Tennessee, guardian ad litem for the minor, Taliah L. B.

OPINION

I.  BACKGROUND

Taliah L. B. ("the Child") was born out of wedlock on August 25, 2006, to Tiffany B. ("Mother") and an unknown father ("Father"). On July 19, 2009, Mother relinquished custody of the Child to Michael S. B., Jr. and Rebecca L. B. (collectively "Custodial Parents"). Mother, while pregnant with her second child, agreed to the arrangement believing that she could return to care for the Child after she completed a Teen Challenge

program in Texas. Mother was unable to complete the program but remained in Texas with her newborn son, Jamichael B. Custodial Parents filed a petition for legal custody of the Child. Mother requested a continuance, alleging that she was not financially able to attend the hearing on the petition for legal custody. The court denied Mother's request, adjudicated the Child as dependent and neglected, and awarded legal custody to Custodial Parents on May 13, 2010. Mother remained in Texas until September 2010, when she moved to Tennessee, obtained employment, and sporadically visited the Child.

On June 30, 2011, Custodial Parents filed a petition to adopt the Child and to terminate the parental rights of Mother and Father.[1] The ground asserted for termination of Mother's rights was abandonment for her willful failure to support the Child. Days later, Mother filed a petition for custody, alleging that she had maintained steady employment for six months and was capable of caring for the Child. The juvenile court stayed the custody proceeding, pending the resolution of the termination petition in circuit court. Prior to the hearing on the termination petition, Mother was arrested. Mother pled guilty to aggravated burglary and theft and received concurrent sentences of four years incarceration, suspended to probation following the service of 120 days in jail. Jamichael B. was placed with Custodial Parents while Mother was in jail.[2]

A hearing was held on the termination petition at which several witnesses testified. Anita Rivers, a licensed clinical social worker, testified that Custodial Parents hired her through Adoption Consultants, a licensed child-placing agency in Tennessee, to perform a home study. She approved the home in June 2011 and completed an updated home study in August 2012. She insisted that the updated study confirmed her original finding, that placement of the Child with Custodial Parents was appropriate.

Ms. Rivers testified that Custodial Parents also sought her counseling services for the Child. She met with the Child on four occasions, starting in December 2011 and ending in February 2012. She recalled that Custodial Parents sought her services because they were concerned that the Child may have been adversely affected by Jamichael B.'s arrival and then absence from their home. She claimed that the Child had established a sibling relationship with Custodial Parents' biological daughter, Ivy B., but simply believed that Jamichael B. was her cousin. She stated that the Child viewed Custodial Parents as her parents and did not have an attachment to Mother even though Mother was her biological parent. She believed that removing the Child from Custodial Parents would be "extremely detrimental." She stated that the Child suffered from attention deficit hyperactivity disorder and would

---

[1] Father's parental rights are not at issue in this appeal because he was never identified.

[2] At some point, Custodial Parents returned Jamichael B. to the Tennessee Department of Children's Services.

experience symptoms later in life that would require one-on-one attention and "a lot of" interaction with the school system. She believed that Custodial Parents were capable of ensuring that the Child received the assistance that was necessary to cope with her condition.

Michael S. B., Jr. ("Husband") testified that he had a Bachelor's Degree in Biology, a Master's Degree in Divinity, and had completed all but his dissertation for a doctoral degree. He was employed by Creative Consulting Services as a support coordinator. Relative to the Child, Husband stated that a minister in Cleveland, Tennessee contacted him in July 2009 about the Child. He recalled that the Child, who was three years old, needed a temporary place to live while Mother attended a program for drug addiction. He related that the Child had resided in his home since their first meeting in 2009 and that the Child was now almost six years old. He stated that at the initial meeting, he and Rebecca L. B. ("Wife") were not given legal custody of the Child. He insisted that they never planned to adopt the Child because they believed that Mother would retrieve the Child.

Husband admitted that he and Wife sought legal custody because they were concerned about their ability to make decisions regarding the Child while Mother was in Texas. He insisted that Mother advised them that she wanted them to obtain legal custody but simply never returned the proper paperwork. He related that once they sought legal custody, they learned that Mother had been investigated by the Tennessee Department of Children's Services ("TDCS").

Husband testified that Mother advised them in February 2010 that she was no longer participating in Teen Challenge but had stayed in Texas. He related that they had "sporadic" contact with Mother, who had obtained employment and was living with someone. He claimed that she asked them if they would "continue keeping" the Child. He stated that they discussed the option of adopting the Child and that Mother agreed and then changed her mind. Mother finally returned to Tennessee in September 2010, and they continued discussing the adoption option. He stated that they had come to somewhat of an agreement and completed a home study before Mother changed her mind again shortly before they filed the termination petition.

Husband testified that Mother never offered any type of monetary support for the Child. He related that they did not expect child support while she attended the rehabilitation program in Texas but that when they learned she quit the program and was employed, they would have accepted monetary support. He conceded that they never actively sought child support by filing a formal request with the court or by asking Mother for child support.

Husband stated that from September 2010 until June 2011, they scheduled visitation appointments with Mother. He recalled that one time, Mother became upset with the Child

when the Child called her by name. He claimed that Mother told the Child that she was her "mommy" and that Mother's assertion confused the Child. They gave Mother money to spend while visiting with the Child, and they loaned her their car seat to transport the Child. He related that one time, Mother brought food to the house for them to prepare during the visit. He claimed that at times, Mother never arrived for her scheduled visitation.

Husband testified that Mother only made two attempts to schedule visitation in the four months preceding the filing of the termination petition. He testified that prior to Mother's last visit with the Child, the Department of Children's Services in Texas contacted them and advised them to prohibit unsupervised visitation. He stated that against his better judgment, he allowed Mother to visit with the Child unsupervised on Mother's Day in May 2011. He related that Mother kept the Child beyond the agreed upon time and that after the visit, they advised her that she would no longer be allowed to visit the Child without supervision. He admitted that when Mother subsequently requested to take the Child to her family's house without their supervision, they advised her to contact their attorney about future visitation. He also admitted that they did not respond to Mother's "numerous text" messages after they advised her to contact their attorney about visitation.

Husband conceded that he and Wife had moved and did not inform Mother of their new address. He explained that the move occurred in February 2012, well after the applicable time period in consideration. He acknowledged that he had also changed his phone number but asserted that Wife had retained her phone number.

Wife testified that she had a Bachelor's Degree in Psychology and a Master's Degree in Counseling. She worked as a consultant with Vanderbilt University and had a contract position with TDCS. She explained that she was responsible for assessing children as they entered state custody and before the child left state custody.

Wife testified that the Child and her biological daughter, Ivy B., were close and considered themselves as sisters. She related that the Child called her "Momma" or "Mommy" and called Husband "Daddy." She claimed that the Child had made "dramatic improvements" since her first day in their home. She stated,

> When [the Child] came into our home, she was [] undisciplined. Some friends of ours . . . referred to her as feral, like a wild cat, because she was . . . hard to handle. She had a lot of behaviors. If we [] tried to [] hold her hand when we were walking in a parking lot from the car to a store, she would try to run off from us and we would have to . . . catch her, and she would kick and scream. We would have bruises on our arms just from [] her fits.

-4-

She related that the Child had trouble sleeping and that she often caught the Child masturbating. She sought counseling for the Child and stated that the Child received counseling from Victoria Davidson and later from Anita Rivers. She claimed that the Child no longer appeared undisciplined and was no longer exhibiting sexual behavior.

Wife testified that they never received child support from Mother but acknowledged that Mother had sent "some gifts" to the Child. She recalled that they received gifts for Christmas 2009 because Mother registered the Child for Angel Tree. She related that Mother sent some gifts for Christmas 2010 and that they had received cards for the Child's birthdays. She recalled that Mother and Lisa Brown ("Grandmother") had also brought clothing and "other necessaries" to the Child a "few times."

Wife testified that she received a call from the Texas Department of Children's Services about Jamichael B. in February or March 2011. She learned that Mother was being investigated for abuse of Jamichael B. and was advised not to allow Mother to have unsupervised visitation with the Child because the allegations against Mother "were serious." She stated that Jamichael B. was subsequently placed with them when Mother was arrested in August 2011. She related that Jamichael B. was still in TDCS custody but resided with another foster family. She claimed that she and the new foster family facilitated visitation between the Child and Jamichael B.

Wife acknowledged that Mother exercised visitation until May 2011, when they told her she could no longer visit with the Child without supervision. Mother asked for another unsupervised visitation after the May 2011 visit. After they informed her that they would rather supervise her visitation, Mother went "ballistic," prompting them to inform her to contact their attorney about future visitation. She claimed that Mother never asked for visitation again. She insisted that the text messages that she subsequently received from Mother always contained the same message, "Tell my daughter that her mother loves her."

Mother denied certifying that she had obtained employment for six months prior to filing her petition for custody. She explained that she had only obtained employment for three to four months. She acknowledged that she had pled guilty to driving while her license was revoked, theft-related offenses, and forgery in 2006. She also acknowledged that she had been charged with shoplifting, felony theft, aggravated burglary, and violating her probation in 2011. She explained that she was charged with shoplifting because she stole diapers from Wal-Mart for Jamichael B and that she never committed aggravated burglary but simply pled guilty for her ex-boyfriend's benefit. Lastly, she acknowledged that she had been charged with drug-related offenses in August 2011. She explained that while the drug-related offenses were pending, she was attempting to get the charges reduced because her attorney and probation officer believed that she was capable of rehabilitation.

Mother conceded that she had never submitted any child support for the Child. She explained that Custodial Parents advised her that they did not expect her to pay child support because she was a single mother. She insisted that she had purchased items for the Child and taken the Child to various restaurants for meals. She acknowledged that while she was living in Texas, she paid bills, provided for Jamichael B., and paid a car payment.

Mother admitted that she had not answered counsel's requests for admissions. She also admitted that she had not allowed the guardian ad litem to inspect her residence because she had been living with Grandmother, who had told her to find somewhere else to live.

Mother claimed that she decided to attend Teen Challenge in Texas because she loved the structure that the program provided. She asserted that she never wanted to leave the Child and that she never believed that she would have to go through the court system to retain custody of the Child. She believed the agreement was always meant to be temporary. She stated that while she attended the program, her ability to contact the Child was limited. She explained that she ultimately left the program because the program was "in the process of closing down." She alleged that when she left the program, Custodial Parents informed her that she could not retrieve the Child because she had failed to complete the program. She learned of the custody hearing less than a week before the court date and simply could not afford the plane ticket to travel to the hearing. She insisted that she never intended for Custodial Parents to have legal custody of the Child. She believed that she could retrieve the Child whenever she was "stable and ready to take care of" the Child.

Mother stated that Custodial Parents first approached her about adoption in September 2010. She never opened the adoption papers because she was "iffy" about separating from the Child when she believed she could improve her life. She said that when she returned to Tennessee, she was "always calling" and "always texting" about scheduling visitation with the Child. She explained that her visits were not as frequent as she hoped because the Child was often out of town or Custodial Parents simply could not fit in her visitation to their schedule for the Child. She contacted the juvenile court "[t]hree to four times" about her inability to visit with the Child. She asserted that Custodial Parents had refused to respond to her requests for visitation and had prevented her from maintaining contact with the Child. She believed that Custodial Parents changed their attitude concerning visitation when she denied their attempt to adopt the Child.

Mother opined that the Child was "very happy" with her and expressed a desire to live with her. She related that her relationship with the Child had been "awesome." She claimed that while TDCS had investigated her ability to care for the Child, TDCS closed each case when they observed her with the Child. She acknowledged that she had been addicted to drugs for approximately seven years and had used drugs during her pregnancy with the Child.

Mother again acknowledged her recent drug-related charges and explained that she was attending counseling and planned on attending a drug and alcohol class. She had also been admitted to Partnership, a social service agency, and had been living there since July 26, 2012. She was attempting to obtain her Graduate Equivalency Diploma, and while she was not employed, she had applied for several positions. She stated that the Child would be allowed to live with her at Partnership if she were given custody of the Child.

Grandmother claimed that she was present when Mother relinquished custody to Custodial Parents, who advised Mother that child support was unnecessary. She testified that she visited with Mother "[j]ust about every day" but complained that she was unable to see the Child. She asserted that she had not seen the Child in approximately two and a half years because Custodial Parents were too busy to schedule visitation with her. She insisted that she had accompanied Mother on three occasions as they attempted to obtain visitation with the Child through the juvenile court system. She opined that she did not have any concerns about Mother's ability to maintain a relationship with the Child. She denied that she told Mother she could no longer live with her.

Alissa Hughes, Mother's case manager at Partnership, testified that she had known Mother for approximately three weeks. She related that she interacted with Mother on a "daily basis" and that Mother had requested assistance with housing, education, counseling, and retaining custody of the Child. She claimed that if Mother retained custody of the Child, Mother would be allowed to live at Partnership with the Child. She opined that Mother had been an active participant in her service plan and was able to provide for the Child.

Following the presentation of the above evidence, the trial court terminated Mother's parental rights, holding that Mother had abandoned the Child by willfully failing to support the Child and by willfully failing to visit the Child[3] and that termination of Mother's parental rights was in the best interest of the Child. Relative to child support, the court found that Mother never submitted child support even though she was "gainfully employed" and had "freely admitted" her employment during the requisite time period. Relative to Mother's failure to visit, the court found that Mother willfully failed to visit the Child during the requisite time period and that her effort to visit was inadequate and amounted to no more than token visitation. This timely appeal followed.

---

[3] Abandonment by failure to visit was not raised as a termination ground against Mother in the petition. The parties presented evidence on both grounds without objection before the trial court ruled on both grounds. *See* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether there was clear and convincing evidence to establish that Mother abandoned the Child.

B. Whether termination of Mother's parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct.

App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

In terminating Mother's parental rights based upon the statutory ground of abandonment, the court considered Mother's failure to remit support and failure to visit for the four months preceding June 30, 2011, the filing date of the termination petition. Thus, the relevant time period was February 28, 2011 to June 30, 2011. A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

This court has consistently held that the term willfulness as it applies to a party's failure to support or failure to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

### 1.

Mother concedes that she failed to submit child support during the relevant time period but asserts that her failure to remit support was not willful. She argues that Custodial Parents advised her not to submit support and would likely have rejected any offer of support. Custodial Parents respond that Mother maintained steady employment for a significant period

of time prior to the filing of the termination petition but never remitted any amount of child support during the relevant time period.

"Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). Mother was born on August 8, 1992; therefore, she was 18 years of age or older during the requisite time period and was presumed to have knowledge of her legal obligation to support the Child. Tenn. Code Ann. § 36-1-102(1)(H). This was not a case where a parent had numerous expenses but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Mother never paid child support and only provided sporadic gifts during the entirety of the Child's stay with Custodial Parents. Mother admitted that she was gainfully employed for at least three or four months prior to the filing of the termination petition. Mother claims that she believed that her arrangement with Custodial Parents was to be temporary in nature and that she did not need to submit child support. The agreement Mother relied upon clearly changed when Custodial Parents obtained legal custody of the Child in 2010 and subsequently broached the subject of adoption with Mother. However, she never offered to support the Child or evidenced an intent to retrieve her after she returned to Tennessee. Accordingly, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Child by willfully failing to remit child support during the relevant time period and that a statutory ground existed for termination of Mother's parental rights.

2.

Mother concedes that she failed to regularly visit the Child but asserts that her failure to visit was not willful. She claims that Custodial Parents impeded her ability to visit. Custodial Parents respond that Mother failed to initiate steps to schedule visitation once the existing arrangement proved unworkable. They note that prior to their refusal to continue unsupervised visitation at Mother's request, Mother only sporadically visited the Child and often missed scheduled visits.

The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *A.M.H.*, 215 S.W.3d at 810 (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re*

*M.L.P.*, 281 S .W.3d 387, 393 (Tenn. 2009) (citation omitted). In *A.M.H.*, the Court was "presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody [] during the 'abandonment' period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights." 215 S.W.3d at 810.

Unlike the situation presented in *A.M.H.*, Mother visited the Child on two occasions during the requisite time period and was subsequently offered the option of supervised visitation when the Mother's Day visit exceeded the agreed-upon arrangement. Mother rejected the offer of supervised visitation. When her request for unsupervised visitation was denied, she did not take any action until after the termination petition had been filed. While Mother's ability to visit with the Child was "restrained" in that Custodial Parents refused the request for continued *unsupervised* visitation, the limitation did not significantly interfere with Mother's ability to visit the Child during the requisite time period. Mother could have arranged for supervised visitation or sought relief through the court system. Mother and Grandmother testified that they consulted with the juvenile court on three occasions; however, the record reflects that Mother filed one petition *after* the termination petition had been filed. With these considerations in mind, we conclude that Mother's two visits during the requisite time period amounted to nothing more than token visitation because the visitation was of such an infrequent nature. Tenn. Code Ann. § 36-1-102(1)(C). Accordingly, we conclude that there was clear and convincing evidence to establish that Mother willfully failed to visit the Child during the relevant time period. Thus, a second statutory ground existed for termination of Mother's parental rights.

B.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (I) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(I). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against Mother. Mother had not made the adjustment of circumstances necessary to provide a stable home for the Child. While Mother's living situation at Partnership was an improvement, housing the Child with her would not be in the Child's best interest when she had only been a participant in the program for a few weeks. Tenn. Code Ann. § 36-1-113(i)(1). Mother maintained sporadic visitation with the Child prior to the relevant time period and only visited the Child on two occasions during the relevant time period. Tenn. Code Ann. § 36-1-113(i)(3). The Child viewed Custodial Parents as her family and despite Mother's assertion, did not appear to have maintained a meaningful relationship with Mother. Tenn. Code Ann. § 36-1-113(i)(4). The Child presently resides in a safe and stable home and has bonded with Custodial Parents, who are willing to adopt her. Removing the Child from Custodial Parents and returning her to Mother, who lived in a shelter at the time of the hearing, would likely traumatize the Child. Tenn. Code Ann. § 36-1-113(i)(5). There were allegations of abuse against Mother relative to Jamichael B., who resided in TDCS custody at the time of the hearing. Tenn. Code Ann. § 36-1-113(i)(6). Questions remain as to whether the physical environment of Mother's potential home would be safe. Mother had only been housed in the Partnership shelter for a few weeks at the time of the hearing. Likewise, she had a criminal history of felony convictions and pending drug-related felony charges. Tenn. Code Ann. § 36-1-113(i)(7). Evidence was not presented specifically relating to Mother's mental and emotional status; however, her history of drug addiction and pending drug-related offenses reflect poorly on her mental status. Tenn. Code Ann. § 36-1-113(i)(8). Mother never submitted child support. Tenn. Code Ann. § 36-1-113(i)(9).

We believe the above considerations overcome Mother's recent attempt at rehabilitation. Mother allowed others to provide for the Child while she refused to put herself in a position in which she could adequately care for the Child, who had understandably established an emotional bond with Custodial Parents and Ivy B. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Tiffany B.

_____
JOHN W. McCLARTY, JUDGE

-14-